CASE NO. 24-1988

IN THE
# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**KATHY B. PATON, As Administratrix of the Estate of Kelsey R. Paton, deceased, and in her individual capacity,**

Plaintiff-Appellant,

**v.**

# CITY OF NORFOLK, VIRGINIA; LARRY BOONE
**Individually and in his official capacity as Police Chief for the City of Norfolk, Virginia; et al.,**

Defendants-Appellees.

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA AT NORFOLK**

**OPENING BRIEF OF PLAINTIFF-APPELLANT – KATHY PATON**

**Matthew J. Weinberg**
**INMAN & STRICKLER, PLC**
**Suite 200**
**575 Lynnhaven Parkway**
**Virginia Beach, VA    23452**
**(757) 486-7055 PH**
**mweinberg@inmanstrickler.com**

 **Counsel for Plaintiff-Appellant**
  **Kathy B. Paton**

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1988__      Caption: __Kathy B. Paton v. City of Norfolk,  et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Kathy B. Paton, As Administratrix of the Estate of Kelsey R. Paton, deceased and in her individual__
(name of party/amicus)

__capacity__

 who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
   If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____  Date: 10/22/24

Counsel for: Kathy B. Paton

- 2 -

Print to PDF for Filing

# **TABLE OF CONTENTS**

Table of Authorities ................................................................ii

Jurisdictional Statement .........................................................1

Statement of Issues ...............................................................1

Statement of the Case ...........................................................1

Summary of the Argument ....................................................5

Argument ............................................................................6

    I. Standard of Review ......................................................6

    II. State-Created Danger Doctrine Applies ......................7

      A. Fourth Circuit Recognition of Doctrine ................8

      B. Affirmative Acts and Eight-Month Gap ............. 14

    III. Protected Liberty Interest in Posthumous Integrity ...........................18

Conclusion ........................................................................ 20

Request for Oral Argument ................................................ 20

# TABLE OF AUTHORITIES

**Cases**

Callahan v. N.C. Dep't of Pub. Safety, 18 F.4th 142 (4th Cir.2021) .................7, 13

DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189 (1989).......7, 8

Doe v. Rosa, 795 F.3d 429 (4th Cir. 2015) ...................................................7, 10, 19

Dwares v. City of New York, 985 F.2d 94 (2d Cir. 1993) ....................................12

Graves v. Lioi, 930 F.3d 307 (4th Cir. 2019) ....................................................7, 11

Martin v. St. Mary's Dep't of Soc. Servs., 346 F.3d 502 (4th Cir. 2003) ..............18

Pena v. Deprisco, 432 F.3d 98 (2d Cir. 2005)......................................10, 12, 14, 18

Pinder v. Johnson, 54 F.3d 1169 (4th Cir. 1995) ............................................8, 9, 10

Robinson v. Lioi, 536 F. App'x 340 (4th Cir. 2013) .......................................11, 12

Semenova v. Md. Transit Admin, 845 F.3d 564 (4th Cir. 2017) ...........................6

Washington v. Hous. Auth. of the City of Columbia, 58 F.4th 170 (4th Cir. 2023)…………………………………………………………………………15

**Statutes**

28 U.S.C. § 1291 (2018) ........................................................................................1

28 U.S.C. § 1331 (2018) ........................................................................................1

Virginia Code §§ 37.2-900 et seq. (2020) .............................................................16

Virginia Code § 32.1-283 (2020) ..........................................................................19

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ................................................................5

Federal Rule of Civil Procedure 12(b)(6) ................................................................6

## STATEMENT OF JURISDICTION

The Eastern District of Virginia Federal Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as the case involves a federal question. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291. After reviewing the written arguments filed by the parties, the trial court entered judgment in favor of the defendants on September 5, 2024. (JA197). Appellant timely filed her Notice of Appeal on October 2, 2024. (JA198).

## STATEMENT OF ISSUES

1.      Whether the district court erred in granting judgment for defendants whose affirmative acts directly increased the harm faced by Kelsey Paton; and

2.      Whether the district court erred by failing to acknowledge a mother's liberty interest in the posthumous bodily integrity of her child.

## STATEMENT OF THE CASE

On or around November 15, 2020, Michael Ebong ("Ebong") committed what would be the first of three sexual assaults performed by incapacitating his young female victims at bars before isolating them in his residence. On this particular evening, Ebong met Sheena West at Central Shore, a Virginia Beach bar, removed her from the bar against her will, brought her to his home, and ultimately caused her death. (JA10). On or around May 19, 2021, Ebong drugged and raped Jane Doe,[1]

---

[1] This woman's name has been removed from the complaint by request.

who only narrowly escaped her captor and death, after meeting her at Seaside Raw Bar. Ebong then returned to his hunting ground at Seaside Raw Bar on July 11, 2021 where he met Kelsey Paton. As he had done at least twice before, Ebong removed her from the bar against her will, brought her to his home in Norfolk, and raped her. (JA12). Kelsey Paton died from an overdose in Ebong's home; she was the second woman within an eight-month period to take her final breath in his Norfolk apartment. While under his control, Ebong inflicted blunt force trauma to her head and caused bruising to her thighs. *Id*.

Central to this appeal are the actions taken by the Norfolk Police Department ("Norfolk PD") while investigating the death of Sheena West, the first of Ebong's known victims during his eight-month spree of serial rape. During the time Ebong committed these offenses, Ebong's mother, Maravia Reid ("Reid") was employed by the Norfolk PD as the Public Information Officer. (JA7–8). She worked closely with and held considerable influence over Larry Boone ("Boone") who was the Norfolk Police Chief during all times relevant to this appeal. *Id*.

In the morning of November 15, 2020, Norfolk PD responded to a call from Ebong reporting the death by drug overdose of Sheena West. Prior to reporting West's death, Ebong contacted his mother, Reid, at Norfolk PD, who instructed Ebong on how to present the death when he called the police to avoid suspicion. (JA7; JA10).

Reid then used her position of influence to instruct the responding police officers to conceal, contaminate, and destroy evidence at the scene that could be used to prosecute her son. Reid further instructed the responding officers not to review Michael Ebong's criminal history either before or after arriving on the scene of West's death. Had this record been reviewed, responding officers would have seen a well-documented history of sexual offenses and crimes against women that were escalating in severity. *Id.* Boone condoned and authorized Reid's instructions to the responding officers. *Id.*

At the instruction of Reid and Boone, the responding Norfolk police officers destroyed, contaminated, and failed to preserve evidence at the scene of West's death. Such evidence included: eyewitness testimony from patrons and employees at the bar, eyewitness testimony from observers at Ebong's home, equipment Ebong used to intoxicate West, remnants of the drugs Ebong forced on West, clothing and personal items of West, as well as statements from Ebong. (JA7–8).

Not only did the Norfolk PD permit Ebong to continue his illegal activity and harm other women, they facilitated it. Knowing Norfolk PD actively covered up his murder of West, Ebong grew bolder in his willingness to drug, rape, and murder other women. (JA11). Norfolk PD was keenly aware that its affirmative actions which included concealing, contaminating, and destroying evidence of Ebong's illegal activity directly increased the danger to other young, female patrons in the

Virginia Beach bars that he frequented. *Id*. The danger that he presented was not to the public at large but was specific to this targeted class of people. The methods he employed to hunt, drug, rape, and assault young, female patrons of Virginia Beach bars were so specific that upon hearing the anticipated evidence the Norfolk Circuit Court denied the Ebong's motion to sever the trials of the three victims. However, the Court ruled that joinder of all three victims referenced in the instant appeal was proper due to the similarities of the victims and in the nature of the offenses and methods employed in committing them.

When Ebong met, drugged, raped, and killed Kelsey Paton on July 11, 2021, he knew that if he again called in the murder as an overdose, responding officers from Norfolk PD would be instructed by Reid to conceal, contaminate, and destroy evidence at the scene of Paton's murder. (JA7-8) Not only did Norfolk PD conceal, contaminate, and destroy evidence, responding Norfolk Police Officers shockingly permitted Ebong to carry Kelsey Paton's body from his home to the transportation vehicle as if he were a member of the Department. This undermined the integrity of the scene, the evidence, and the Norfolk PD's commitment to investigating suspicious deaths. (JA12–14).

Until Ebong's third, and only surviving victim, Jane Doe, contacted Norfolk PD about her experience with him, Norfolk PD had not filed any charges against Ebong. Norfolk PD had plenty of time to consider their actions and take remedial

measures. Their actions were not in response to an exigency. This was a considered and deliberate response to protect Ebong at the behest of Reid and members of the Norfolk PD. *Id*.

Plaintiff Kathy Paton commenced this action against Norfolk PD on behalf of the estate of her daughter, Kelsey Paton and also on one cause of action of her own. By leave of the trial court, she amended her complaint for the second time on December 14, 2023. All defendants filed motions to dismiss the Second Amended Complaint, and the parties briefed the issues. In her memorandum opinion, the trial court overruled defendants' motion to dismiss under Federal Rule 12(b)(1); however, the trial court granted judgment to all defendants under Federal Rule 12(b)(6). Plaintiff/Appellant timely appealed.

## SUMMARY OF THE ARGUMENT

Appellant respectfully asserts that the trial court erred in granting defendants' motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). The trial court predicated its dismissal upon Plaintiff/Appellants failure to allege "immediate interactions between the state actor and the plaintiff that evince a sufficient causal connection, or nexus, between the state action and the alleged harm." (JA193). Appellant contends that the Fourth Circuit does not require immediate interactions between the plaintiff and state actor; but rather immediate interactions between the state actor and the harm caused to the plaintiff. Accordingly, Appellant sufficiently

stated a claim for relief by asserting that the defendants' affirmative acts emboldened and enhanced the danger she faced as a specific class of women susceptible to Ebong.

Appellant additionally contends the trial court's ruling that Kathy Paton did not state a personal claim for relief because her substantive due process violation argument did not implicate a recognized liberty interest. (JA195-96). Appellant asserts that the trial court should have considered the specific liberty interest in the posthumous bodily integrity of a parent's child. The Fourth Circuit clearly recognizes a liberty interest in both familial integrity and bodily integrity. Accordingly, the Fourth Circuit should recognize a liberty interest that results from the intersection of these established rights.

## ARGUMENT

### I. STANDARD OF REVIEW

Ms. Paton appeals the judgment the trial court awarded defendants on their Federal Rule of Civil Procedure 12(b)(6) motions. This Court applies *de novo* review to dismissal of a complaint under these circumstances, "assuming as true the complaint's factual allegations and construing 'all reasonable inferences' in favor of the plaintiff." *Semenova v. Md. Transit Admin*, 845 F.3d 564, 567 (4th Cir. 2017). This standard applies to all issues addressed in this appeal.

## II.  STATE CREATED DANGER DOCTRINE APPLIES TO THE NORFOLK POLICE DEPARTMENT'S AFFIRMATIVE ACTION EMBOLDENING MICHAEL EBONG RESULTING IN KELSEY PATON'S DEATH

Ms. Paton asserts a claim based upon the Norfolk Police Department defendants' (collectively the "Norfolk PD") affirmative acts of obstructing justice at the scene of Ms. West's murder directly emboldening and enabling Ebong to sexually assault additional female victims by drugging young women at Virginia Beach bars, knowing he could count on defendants to protect him from scrutiny. Norfolk PD's affirmative acts fall within the range of behavior contemplated by Chief Justice Rehnquist when he recognized what courts now refer to as the state-created danger doctrine – a narrow exception to the rule that state actors do not typically owe a duty to protect – which arises when a state actor enhances the danger of violence faced by the plaintiff. *DeShaney v. Winnebago County Department of Social Services¸* 489 U.S. 189, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989).

The state-created danger doctrine applies where (1) the state actor "created or increased the risk" of the harm to the victim and (2) "did so directly through affirmative acts." *Doe v. Rosa*, 795 F.3d 429, 439 (4th Cir. 2015). "It is a 'narrow' exception to the general rule that state actors are not liable under the Due Process Clause for harm caused by third parties." *Callahan v. N.C. Dep't of Pub. Safety*, 18 F.4th 142, 146-147 (4th Cir. 2021) (citing *Graves v. Lioi*, 930 F.3d 307, 319 (4th Cir. 2019). "This exception was implied from *DeShaney*'s explanation that '[w]hile

the State may have been aware of the dangers that [the child] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.'" *Id.* (citing *DeShaney*, 489 U.S. at 201). By emboldening Ebong to drug, sexually assault and murder more women, defendants rendered Kelsey Paton more vulnerable to him.

## A. THE FOURTH CIRCUIT RECOGNIZES THE STATE-CREATED DANGER DOCTRINE FOR AFFIRMATIVE ACTIONS WITH A DIRECT CAUSAL CONNECTION TO A PLAINTIFF'S HARM

In 1995, the Fourth Circuit considered the *DeShaney* state-created danger doctrine in *Pinder v. Johnson¸* 54 F.3d 1169 (4th Cir. 1995). In *Pinder*, a woman threatened by her ex-boyfriend contacted the police, who arrested the ex-boyfriend. After assuring the woman that he would remain incarcerated, the officer released the ex-boyfriend who returned to the woman's house and burnt it down, killing the three children inside. The Fourth Circuit first ruled out the existence of a special relationship between the police and the woman, finding that promises do not create a special relationship – custody does. *Id.* at 1175. However, the Fourth Circuit turned its analysis to the woman's attempt to parse the officer's action as "*affirmative* misconduct by the state in 'creating or enhancing' the danger, instead of an omission." *Id.* (emphasis in original). Ultimately, the *Pinder* Court held that although assurances do not give rise to civil liability, "[a]t some point on the spectrum between action and inaction, the state's conduct may implicate it in the

harm caused….” *Id.* Here, by failing to preserve and destroying evidence of Ebong's murder of West, defendants' actions fall within the point of the spectrum that implicate it in the harm caused to Kelsey Paton.

At the time of defendants' cover-up of Ebong's murder of West, Ebong had a documented history of sexual offenses and violence against women. Unlike *Pinder,* defendants cannot claim Ebong's harm came solely from omissions, as their affirmative actions prevented Ebong's murder from detection thereby enabling and emboldening Ebong to continue to harm young Virginia Beach females frequenting bars. Thus, defendants' affirmative acts threw Kelsey Paton to the Ebong lion. *Pinder*, 54 F.3d at 1177.

In its memorandum opinion, the trial court agreed with Plaintiff's characterization of the defendants' actions as affirmative acts as opposed to omissions, (JA189–90), but concluded that the Fourth Circuit Court requires immediate interactions between the state actor and the plaintiff regardless of action versus omission and that therefore the affirmative acts could not provide a causal connection. (JA193–94). However, this line of reasoning would in effect abrogate the Fourth's Circuit's state-created danger doctrine. Fact patterns involving a direct interaction between a state actor and the plaintiff typically involve a special

relationship – for instance a custodial relationship – which is a separate exception to the general premise that the state has no duty to protect.[2]

The Fourth Circuit began using the phrase "immediate interactions" in the context of the state-created danger doctrine in *Pinder¸* when it cautioned courts to "resist the temptation to inject" an alternate framework into omission cases by "stretching the concept of 'affirmative acts' beyond the context of immediate interactions between the officer and the plaintiff. *Pinder*, 54 F. 3d at 1176. Crucially, this holding did not consider interactions between the officer and the predator emboldening the predator, but rather applied to omissions of the officer by failing to stop a predator.

Twenty years after *Pinder*, the Fourth Circuit Court rearticulated the difference between omissions in failure to protect versus affirmative acts emboldening the predator in *Doe v. Rosa*,795 F.3d 429 (4th Cir. 2015). The *Doe* Court noted that when a state actor permits a victim's "continued exposure to an existing danger by failing to intervene" such circumstance constitutes an omission because nothing by the officer changed the preexisting danger faced by the victim. *Doe* 795 F. 3d at 439. However, the *Doe* Court specifically found that its unpublished

---

[2] The 2nd Circuit articulates this distinction as follows: "'special relationship' liability arises from the relationship between the state and a particular victim, whereas '***state created danger***' liability arises from the relationship between the state and the private assailant." *Pena v. Deprisco*, 432 F.3d 98, 109 (2d Cir. 2005) (emphasis in original).

case, *Robinson v. Lioi¸* 536 F. App'x 340 (4th Cir. 2013), which denied a motion to dismiss a state-created danger doctrine claim, did not contradict its position on omission versus affirmative act. The *Doe* Court found that *Robinson* correctly affirmed the denial of the motion to dismiss because the police officer "put the victim in a far worse position by acting to thwart the arrest warrant" for domestic violence, providing the perpetrator the opportunity to murder his wife. *Id.* at 440 citing *Robinson*, 536 F. App'x at 345 (internal quotations omitted). Here, just as in *Robinson¸* the defendants put Kelsey Paton in a far worse position by thwarting Ebong's arrest for murder. Thus, by treating this case as an omission case after finding that it was actually an affirmative act case, the trial court erred in finding judgment for the defendants.

Six years after *Robinson v. Lioi¸* the Fourth Circuit Court reviewed the same case through the lens of the trial court's award of summary judgment in *Graves v. Lioi¸* 930 F.3d 307 (4th Cir. 2019). The *Graves* Court gave careful thought to the letters and texts written by the defendant to the perpetrator, and ultimately found that a jury could not conclude from either that the defendant participated in a conspiracy that allowed the perpetrator to evade arrest thereby enhancing the danger to the victim; as such, the defendant's actions could not support a cognizable due process claim because they were not causally connected to the victim's harm. *Graves*, 930 F.3d at 322-23. While the Fourth Circuit specified that "[w]hatever 'affirmative acts'

a plaintiff relies on must have a direct causal connection to the *harm* that ultimately befell the victim," it did not mandate that those affirmative acts had to be done directly to the victim. *Id.* at 323 (emphasis added).

The clear difference between the Fourth Circuit Court's rulings in *Robinson v. Lioi* and *Graves v. Lioi*, stems from the role the state actor's affirmative acts played in the victim's harm. In *Robinson¸* the Court reviewed a denial of motion to dismiss under the plaintiff's allegation that the defendant's acts directly contributed to the victim's harm by enabling the perpetrator to avoid arrest; whereas in *Graves*, the evidence reviewed at summary judgment revealed that the defendant's acts could not have contributed to that harm and on that basis affirmed the summary judgment.

The Fourth Circuit's analysis in *Graves* is similar to the Second Circuit's treatment of state-created danger claims which makes a distinction between conduct that is passive versus conduct which is affirmative. *See e.g. Dwares v. City of New York¸* 985 F.2d 94 (2d Cir. 1993). The Second Circuit focuses on the affirmative conduct of the state actor which encouraged the perpetrator and holds that when state officials communicate to a private person that he or she will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life of others, those officials can be held liable under the state-created danger doctrine. *Pena v. Deprisco*, 432 F.3d 98, 111 (2d Cir. 2005).

The Second Circuit's analysis also aligns with the Fourth Circuit's decision in *Callahan v. N.C. Dep't of Pub. Safety*, 18 F.4th 142 (4th Cir. 2021), in which the Court emphasized that to advance a claim under the state-created danger theory, a plaintiff must plausibly allege more than a mere failure to protect from danger; a plaintiff must plead that the state affirmatively created or enhanced the danger. *Callahan*, 18 F.4th at 143. In *Callahan¸* the plaintiff was tragically beaten and killed by an inmate after she wrote a disciplinary report regarding the inmate's failure to follow a direct order. *Id.* at 144. The plaintiff alleged a state-created danger claim based upon the defendants' failure to take heed at the inmate's warning one week earlier of his homicidal thoughts and based upon the defendants' staffing only three duty officers despite its policies and procedures requiring four officers per shift. *Id.*

Ultimately, the *Callahan* Court affirmed the trial court's dismissal of the plaintiff's claim, and identified critical questions for courts to use to analyze state-created danger doctrine claims: "What is the pertinent danger, and did the state create it?" *Id.* at 148. Applying the *Callahan* questions to Kelsey Paton's case is straightforward. The pertinent danger was Ebong, and although the defendants did not create the danger Paton faced from him, they did enhance it. Unlike the defendants in *Callahan¸* here the defendants did not simply ignore the possibility that Ebong would drug, sexually assault, and kill another woman, they emboldened him to do so by thwarting his detection from his murder of West. This is the exact

13

sort of conduct the Second Circuit recognizes as a state-created danger claim. *See Pena*, 432 F.3d at 111.

Hypothetically, what if the state officials in *Callahan* had informed the inmate that he would not be punished for beating Callahan to death? The answers to the *Callahan* questions remain the same, the inmate was the danger, and the state officials did not create the danger. However, under those circumstances the state officials clearly enhanced the danger faced by Callahan by emboldening the inmate. In this case, the defendants did not directly inform Ebong he would not be punished for killing Paton; rather, defendants showed Ebong they would work with him to cover up his murder of West, thereby increasing the danger Paton faced from Ebong. Defendants' actions played a direct causal connection to Ebong's decision to harm Paton. Due to the direct casual connection between the defendants' affirmative actions and Kelsey Paton's harm, this Honorable Court should reverse the trial court's judgment to defendants' and remand for further proceedings.

### B. DEFENDANTS' AFFIRMATIVE ACTS ENHANCED THE DANGER KELSEY PATON FACED FROM MICHAEL EBONG REGARDLESS OF THE EIGHT-MONTH GAP BETWEEN THEIR ACTIONS AND KELSEY PATON'S DEATH

The trial court erroneously granted defendants' judgment on the additional basis of the eight-month gap between the defendants' actions in the West investigation and the death of Kelsey Paton finding that the gap in time stretched the affirmative acts concept too far. [MEMO at 12]. The trial court's ruling is very

similar to a trial court decision this Court reversed in *Washington v. Hous. Auth. of the City of Columbia*, 58 F.4th 170 (4th Cir. 2023).

In *Washington¸* the Housing Authority installed a gas-burning furnace in a housing complex it controlled in 1990, but failed to inspect or maintain the furnace. *Washington v. Hous. Auth. of the City of Columbia*, 58 F.4th 170, 175 (4th Cir. 2023). Further, although required by state and local law, the Housing Authority never installed carbon monoxide detectors in its units. By 2017, recognizing the immediate danger of living spaces without carbon monoxide detectors, the Housing Authority adopted a policy requiring privately owned properties to install a carbon monoxide detector within 24 hours if it did not already have one. The Housing Authority failed to apply its own policy to its units, resulting in the plaintiff's death from carbon monoxide poisoning more than a year later. *Id*. at 176. The trial court dismissed the plaintiff's deliberate indifference claim on a motion to dismiss, concluding that the plaintiff failed to plead sufficient facts to establish causation. Specifically, the court ruled that the plaintiff failed to allege facts showing the deficiencies made the plaintiff's death bound to happen rather than merely likely to happen. *Id.*

The *Washington* Court reversed the trial court's decision, noting the difference between an "intent to harm" standard in emergency situations versus a "deliberate indifference" standard when "actual deliberation is practical." *Id.* at 178.

Thus, under the Fourth Circuit's analysis of conscious shocking action in violation of due process, time actually lowers the standard of culpability necessary to state a claim because the state official had time to consider the harm and take action but chose not to do so.

At first blush, a furnace leaking carbon monoxide is clearly distinct from a sexual predator. But, when considered, the differences are merely superficial. The furnace was not guaranteed to leak carbon monoxide and Ebong was not guaranteed to repeat his offense. Crucially however, the Commonwealth of Virginia specifically recognizes the high likelihood that this category of offender will reoffend in a sexually violent manner. In fact, the danger is so great that Virginia created an entire statutory regime addressed to civilly commit sexually violent predators outside of their criminal sentencing. Virginia Code §§ 37.2-900 *et seq*. In both situations, the harm was likely to happen rather than bound to happen. In both situations, the state actor only knew the perpetrator, not the victim. In both cases, the state actor requires a warning label.[3] Finally, in both situations, the victim was not the public at large but a clearly defined group. In *Washington* that group was tenants of the Housing Authority, in our case, that group is women in their 30s to early 40s who enjoy having a few drinks at local bars.

---

[3] Carbon monoxide detectors require warning labels as do sex offenders required to register and/or who are labeled as "sexually violent predators" in a civil hearing.

The key distinction between deliberate indifference cases versus state-created danger cases is that deliberate indifference focuses on non-action by the state actor with time to deliberate while state-created danger requires affirmative acts by the state actor which enhanced the risk of harm faced by the victim. By obstructing justice, the Norfolk P.D. committed the required affirmative acts which emboldened the perpetrator. Additionally, the Department had time to deliberate on its obstructive acts and take corrective action to rectify it but chose not to remediate. Thus, rather than eliminate the causal connection between the affirmative acts and Ebong's violence, the eight-month gap only further amplified the likelihood that Ebong would reoffend while underscoring the intention of Norfolk P.D. to continue in its willingness to assist Ebong through obstructing, concealing, and destroying evidence of his crimes.

Had Ebong performed a different violent act, the trial court's concern of stretching the affirmative acts concept too far would clearly apply. For example, if Ebong drove heavily intoxicated and crashed and killed a pedestrian, his harm of drunk driving would trace to his harm of murdering West enhanced by the Norfolk P.D.'s affirmative acts. This is not the case. Ebong drugged, sexually assaulted, and killed Kelsey Paton in the exact same manner in which he drugged, sexually assaulted, and killed Sheena West. Norfolk P.D. was well aware of the predatory

lion it unleashed to hunt additional prey; it cannot exonerate itself from liability because the lion took eight-months before it killed another victim.[4]

 This Honorable Court should reverse the trial court's decision for defendants on a motion to dismiss and remand for further proceedings.

### III. KATHY PATON HAS A PROTECTED LIBERTY INTEREST IN THE POSTHUMOUS BODILY INTEGRITY OF HER CHILD

 Kathy Paton, in her personal capacity as Kelsey Paton's mother, asserts Norfolk PD's disregard for Kelsey Paton's family by permitting Ebong to carry his victim's corpse in plain public view of onlookers shocks the conscience and thereby violates her substantive due process rights. This trial court stated that even if the defendants' actions shock the conscious, Plaintiff failed to state a claim because she had not articulated a specific liberty interest violated by Norfolk PD's actions. (JA195-96). Contrary to the trial court's ruling, Plaintiff articulated a liberty interest in the posthumous bodily integrity of her child.

 The Fourth Circuit clearly recognizes that a liberty interest due process right called familial integrity. The right typically arises as a "complicated balance between parents' rights to raise their children and a State's interest in protecting its minor citizens". *See Martin v. St. Mary's Dep't of Soc. Servs.*, 346 F.3d 502, 506 (4th Cir.

---

[4] Or as the *Pena* Court analogized "the police officers … did not bring the victim to the snakes; they let loose the snakes upon the victim." *Pena*, 32 F.3d at 109.

2003). Familial integrity establishes that a mother's liberty interest includes the treatment of her children.

The Fourth Circuit also recognizes an established substantive due process right against state actor conduct that deprives an individual of bodily integrity. *See e.g., Doe*, 795 at 436-37. Unquestionably, a state actor enabling a sexual offender to carry the body of his victim, deprives that victim of her bodily integrity.

Thus, in between the concepts of familial integrity and bodily integrity lies the situation at bar: the posthumous bodily integrity of a parent's child. Although not discussed by prior cases, the Virginia General Assembly has recognized the posthumous right of next of kin through legislation. *See e.g.,* Virginia Code § 32.1-283. Code § 32.1-283 provides numerous restrictions upon a state actor's handling of a dead body and requires authority from next of kin prior to the Office of the Chief Medical Examiner performing procedures on the dead body. The General Assembly specifically recognizes a family's interest in the treatment of the body of its kin.

Norfolk PD's disregard of Kathy Paton's interest in the treatment of the body of her daughter is open and obvious. She will live with the haunting image of her daughter's killer carrying her body out of her death site as if he were an honored member of the police department for the rest of her life. Her substantive due process right in the liberty of the posthumous bodily integrity of her daughter protects against

the Norfolk PD's acts. Accordingly, this Honorable Court should remand this claim for further proceedings.

## CONCLUSION

For the foregoing reasons, Plaintiff-Appellant respectfully requests that this Honorable Court REVERSE the Order granting judgment to defendants, and REMAND the case to the district court for further proceedings as appropriate.

## REQUEST FOR ORAL ARUGMENT

Appellant believes an oral argument would be helpful to further elucidate the novel claims raised by this appeal, and therefore requests a hearing on this matter.

Respectfully submitted,

/s/ *Matthew J. Weinberg*
Matthew J. Weinberg, Esquire (VSB# 88664)
INMAN & STRICKLER, P.L.C.
575 Lynnhaven Parkway, Suite 200
Virginia Beach, Virginia 23452
Telephone:  (757) 486-7055
Facsimile:  (757) 431-0410
E-mail: mweinberg@imanstrickler.com
*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

I, Matthew J. Weinberg, as counsel of record in this matter, certify that this Brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

This document contains 4638 words.

This document complies with the typeface requirements because it has been prepared in a proportional spaced typeface using Microsoft Word in 14-point Times New Roman.

/s/ *Matthew J. Weinberg*
Matthew J. Weinberg, Esq.